Citation Nr: 1730430 
Decision Date: 07/31/17 Archive Date: 08/04/17

DOCKET NO. 07-36 329 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs (VA) Regional Office (RO) 
in Winston-Salem, North Carolina


THE ISSUE

Entitlement to an effective date earlier than April 25, 2000, for the award of a total disability rating based upon individual unemployability due to service-connected disabilities (TDIU). 


REPRESENTATION

Veteran represented by: Robert V. Chisholm, Attorney at Law


ATTORNEY FOR THE BOARD

J.A. Flynn, Counsel




INTRODUCTION

The Veteran served on active duty from June 1959 to April 1962.

This matter originally came before the Board of Veterans' Appeals (Board) on appeal from a March 2002 rating decision of the VA RO that granted a TDIU effective August 27, 2001. A November 2006 rating decision granted an effective date of April 25, 2000. The Veteran appealed this decision to the Board, and in July 2011, the Board denied the Veteran's claim of entitlement to a TDIU before April 25, 2000. 

The Veteran timely appealed the Board's July 2011 decision to the United States Court of Appeals for Veterans Claims (Court). In a September 2012 Memorandum Decision, the Court vacated the Board's July 2011 decision. The Board again denied the Veteran's claim in March 2013. The Veteran timely appealed this decision to the Court, and in an April 2014 Memorandum Decision, the Court vacated the Board's March 2013 decision. 

This appeal was most recently before the Board in November 2016, when it remanded the Veteran's claim in order to obtain pertinent employment records from the Office of Personnel Management (OPM). As is discussed in greater detail below, the Board finds that its remand instructions have been substantially complied with, and the Board will proceed in adjudicating the Veteran's claim. See Stegall v. West, 11 Vet. App. 268, 271 (1998) (noting that when the remand orders of the Board are not complied with, the Board errs as a matter of law when it fails to ensure compliance); see also D'Aries v. Peake, 22 Vet. App. 97, 105 (2008); Dyment v. West, 13 Vet. App. 141, 146-47 (1999).


FINDING OF FACT

Before April 25, 2000, the evidence does not establish that the Veteran was unable to secure and follow substantially gainful employment due to service connected disability.

CONCLUSION OF LAW

The criteria for an effective date before April 25, 2000, for the award of a TDIU have not been met. 38 U.S.C.A. §§ 5107, 5110 (West 2014); 38 C.F.R. §§ 3.102, 3.114(a), 3.400 (2016).


REASONS AND BASES FOR FINDING AND CONCLUSION

Duties to Notify and Assist

VA has a duty to notify and assist claimants in substantiating a claim for VA benefits. 38 U.S.C.A. §§ 5103, 5103A (West 2014); 38 C.F.R. § 3.159 (2016). The Veteran's claim of entitlement to an earlier effective date is a downstream issue from the initial award of a TDIU, and therefore additional notice is not required. Once a decision awarding service connection, disability ratings, and effective dates has been made, statutory notice has served its purpose, and its application is no longer required because the claim has already been substantiated. Dingess v. Nicholson, 19 Vet. App. 473 (2006). Furthermore, the Veteran has not alleged prejudice from any downstream notice defect. See Shinseki v. Sanders, 129 S. Ct. 1696 (2009) (discussing the rule of prejudicial error), nor have the Court's September 2012 and April 2014 Memorandum Decisions identified any such error. Thus, adjudication of his claim at this time is warranted.

The Board also finds that VA has made reasonable efforts to assist the Veteran in obtaining evidence necessary to substantiate his claims. 38 U.S.C.A. § 5103A (West 2014). With regard to the duty to assist, the Board must determine if a medical opinion is necessary to make a decision on the claim. 38 U.S.C.A. § 5103A(d); see also McLendon v. Nicholson, 20 Vet. App. 79, 81-86 (2006); Wells v. Principi, 326 F.3d 1381, 1383-84 (Fed.Cir.2003). 

As directed by the Court's September 2012 Memorandum Decision, the Board has considered whether a retrospective medical opinion is necessary. See Chotta v. Peake, 22 Vet. App. 80, 85 (2008). In this case, the Board has determined that a retrospective medical opinion assessing the impact of the Veteran's back disability on his employability is not necessary. The issue of employability is ultimately a factual determination, rather than a medical determination. See Geib v. Shinseki, 733 F.3d 1350, 1354 (Fed. Cir. 2013) ("[A]pplicable regulations place responsibility for the ultimate TDIU determination on the VA [adjudicator], not a medical examiner."); see also Floore v. Shinseki, 26 Vet. App. 376, 381 (2013) (holding that, in a multiple-disability TDIU determination, the need for a combined-effects medical examination or opinion should be determined on a case-by-case basis, and depends on all evidence of record); Smith v. Shinseki, 647 F.3d 1380, 1386 (Fed. Cir. 2011) (noting that "a vocational expert could be 'necessary' under the facts of a particular case"). The Board's analysis below finds that the weight of the evidence is against a finding that the Veteran was unable to maintain substantially gainful employment before April 25, 2000. In light of the foregoing, the Board concludes that a retrospective medical opinion is not necessary, and ordering such an opinion would only delay the disposition of the Veteran's claim. 

The Board further acknowledges the Veteran's contentions that his VA examination reports contain inaccuracies. For example, the Veteran disputes the contention in the February 1997 examination report that he was at "maximum disability" at the time of examination. While this may be so, the Board has considered the totality of the evidence of record in rendering its decision, and not simply a "snapshot" of the Veteran's symptoms at any particular moment during the appeal. The Board further notes that the Veteran received an additional examination following the February 1997 examination, with findings that were broadly consistent with the earlier examination. The Board finds that the medical evidence of record is adequate for the purpose of rendering a decision in this case. 

The Court's April 2014 Memorandum Decision indicated that VA failed to undertake reasonable efforts to obtain the Veteran's basic employment information. While the Court acknowledged that VA sent letters to the Veteran's three former employers in July 1999, the Court noted that VA did not make a follow-up attempt to obtain such information, nor did VA provide the Veteran with notice that a second attempt would be futile. 

Following the Court's April 2014 Memorandum Decision, in August 2014, the Veteran's representative contacted each of the Veteran's three former employers in an attempt to obtain the Veteran's personnel records. In September 2014, the insurance company that employed the Veteran responded that it could not locate records of employment for the Veteran. In December 2014, the Veteran's representative, after attempting to contact the Veteran's employers, indicated that the Veteran did not believe that additional efforts would produce additional employment records. The representative indicated that the Veteran considered the record to be fully developed and requested that the Board proceed to a decision. 

The Board again remanded the Veteran's claim in January 2015, rejecting the Veteran's attempt to waive VA obtaining his employment information. Pursuant to the Board's remand, in January 2015, VA requested that the Veteran's three identified employers provide pertinent employment information. In February 2015, a letter that VA sent to the realty company was returned as undeliverable. In December 2015, VA informed the Veteran of the efforts that it had undertaken to obtain information relating to his employment, and it requested additional employment information from the Veteran. VA sent a follow-up request to the insurance company at an alternate address, and in January 2016, this request was again returned as undeliverable. In February 2016, upon review of the record, the Veteran's representative agreed that the Board's remand instructions were complete. The USPS responded for the request for employment information in February 2017.

The Board concurs with the Veteran and finds that adequate efforts have been undertaken to obtain employment records from the two employers whose records remain outstanding, and any additional efforts to locate the Veteran's records would be futile. In sum, all records pertinent to the effective date claim are of record. In December 2014, the Veteran's representative indicated that the Veteran did not wish to participate in a hearing before the Board. There is no indication in the record that there is any additional relevant evidence that has not been associated with the claims files. Under the circumstances, the Board finds that there is no reasonable possibility that further assistance would aid the Veteran in substantiating the claim, and the Board will proceed with a decision.

Earlier Effective Date

The Veteran argues that he is entitled to an effective date earlier than April 25, 2000, for the award of a TDIU. 

A TDIU will be granted when the evidence shows that a veteran is precluded, by reason of service connected disability, from obtaining and maintaining any form of gainful employment consistent with his education and occupational experience. 38 C.F.R. §§ 3.340, 3.341, 4.16 (2016). Substantially gainful employment is employment that is ordinarily followed by the nondisabled to earn a livelihood, with earnings common to the particular occupation in the community where the employee resides. The term suggests a living wage. Ferraro v. Derwinski, 1 Vet. App. 326 (1991). The ability to work sporadically or to obtain marginal employment is not substantially gainful employment. 38 C.F.R. § 4.16(a) (2016); Moore v. Derwinski, 1 Vet. App. 356 (1991). Employment may be marginal even when the Veteran's earned income exceeds the poverty threshold if the Veteran is employed in a protected environment such as a family business or sheltered workshop. 38 C.F.R. § 4.16(a) (2016).

In determining whether unemployability exists, consideration may be given to the veteran's level of education, special training, and previous work experience, but not to his age or to any impairment caused by non-service-connected disabilities. 38 C.F.R. §§ 3.341, 4.16, 4.19 (2016).

Benefits based on individual unemployability are granted only when it is established that the service connected disability or disabilities are so severe, standing alone, as to prevent the retaining of gainful employment. If there is one service-connected disability, it must be rated at 60 percent or more. 38 C.F.R. § 4.16(a) (2016). 

A TDIU claim is a claim for increased compensation, and the effective date rules for increased compensation apply to a TDIU claim. Hurd v. West, 13 Vet. App. 449 (2000). The effective date of an award of increased compensation shall be the earliest date as of which it is factually ascertainable that an increase in disability had occurred, if the application is received within one year from such date. Otherwise, the effective date will be the date of VA receipt of the claim for increase, or the date entitlement arose, whichever is later. 38 U.S.C.A. § 5110(a),(b)(2) (West 2014); 38 C.F.R. § 3.400(o) (2016); Hazan v. Gober, 10 Vet. App. 511 (1997); Harper v. Brown, 10 Vet. App. 125 (1997); VAOPGCPREC 12-98.

Turning to the facts in this case, the Veteran was awarded a TDIU with an effective date of April 25, 2000. The Veteran has argued that the effective date for this award should be as early as July 29, 1992, when he filed a claim of entitlement to a TDIU. 

The Board notes that with the exception of periods of total disability due to convalescence, the Veteran was in receipt of a single 60 percent disability evaluation for his low back strain from July 29, 1992, to April 25, 2000. The Veteran's disability thus meets the schedular criteria for a TDIU throughout the period on appeal. With the Veteran's disability meeting the schedular criteria for the award of a TDIU since the time he filed his claim on July 29, 1992, the remaining question is whether the evidence demonstrates that the Veteran's service connected back disability rendered him unable to secure and follow a substantially gainful occupation at any time before April 25, 2000. 

By way of history, the Board notes that the Office of Personnel Management (OPM) indicated that the Veteran began work at the USPS on April 30, 1983. The Veteran has stated that he completed four years of college, earning a bachelor of science degree in 1986. 

In February 1991, the Veteran reported that his back symptoms had improved, with numbness "practically gone" from his left leg. In August 1991, the Veteran complained of low back discomfort, and he was employed as a window clerk with the USPS. 

In January 1992, the Veteran indicated that he continued to have "bad days" with his back. The Veteran was engaged in stand-up window work at the USPS, which the Veteran reported was better than his work involving lifting. The Veteran had a friend who could help with his work. On July 9, 1992, the Veteran fractured his left leg in an accident involving his garden tractor. On July 13, 1992, the Veteran underwent a surgical open reduction and internal fixation of the tibial plateau as a result of this fracture, and he remained in the hospital until July 16, 1992. The Veteran filed his claim of entitlement to a TDIU on July 29, 1992. 

In an August 11, 1992, follow-up appointment following the Veteran's leg fracture, a physician noted that "as for returning to work, if [the Veteran] has a sit-down job, sorting mail, [the physician] saw no reason why [the Veteran could] not do that type of work". In August 1992, the Veteran reported experiencing a subjective improvement in his low back disability. On August 26, 1992, the Veteran reported that his "back pain [was] minimal at this time". OPM indicated that the Veteran's employment with the USPS ended on August 28, 1992, as the result of an "optional retirement". 

In July 1993, a VA clinician noted that the Veteran was ambulating well since fracturing his left knee, although he did have a limp and difficulty squatting as a result of his left lower extremity problems. In July 1993, a VA clinician noted that the Veteran had been told not to lift with his back and also was having difficulty lifting due to post-operative residuals of a left knee fracture. In August 1993, a private clinician indicated that the Veteran's back pain had been doing well until a few days before; the Veteran complained of lumbar pain with radiation down the left leg. On examination, there was tenderness to percussion and palpation. 

During an October 1993 hearing before RO personnel, the Veteran stated that before breaking his leg, he had been able to lift 40 to 70 pounds because he used his knees to take pressure off his back. The Veteran indicated that he could no longer lift such weights because of his left knee fracture. The Veteran indicated that he had not been able to sit for 10 years, and he could not work in a position in which he had to sit. 

The Veteran underwent a neurological examination in December 1993, at which time the Veteran reported that he retired early from the USPS because of an "inability to lift and pursue this occupation". The Veteran otherwise indicated that he had worked as a salesman for a realty company since June 1993. The Veteran worked no set hours, but instead earned a commission, working when he "fe[lt] like it". The Veteran stated also that he had not been able to "work regular" since July 1992. The Veteran indicated that he had pain in the low back that radiated into the left lower extremity and caused weakness, falls, and loss of motion. Prolonged standing or sitting was difficult and lifting caused significant pain. The Veteran indicated that his July 1992 fracture of the left tibia compounded his symptoms. Physical examination indicated that the Veteran had diminished strength in the left leg. A sensory examination revealed the loss of pinprick, light touch, and vibratory sensitivity in the left leg. The examiner did not render an opinion addressing whether the Veteran's neurological symptoms prevented him from securing or maintaining gainful employment. 

In December 1994, the Veteran reported some improvement in his back symptoms, stating that his pain had gone away completely after taking a bath. According to the Veteran, he had not experienced any severe back pain since that time and decided not to pursue any surgical options. In July 1995, the Veteran reported experiencing problems with his back. In February 1996, the Veteran reported that he was having episodes of very severe low back pain. In July 1996, a clinician noted that the Veteran had lost weight, which the Veteran attributed to a change of diet and exercise. 

During a September 1996 Board hearing, the Veteran reported that he had retired from the USPS after 26 years working as a letter carrier and a clerk. The Veteran indicated that took an early retirement, because he "had the broken leg so [he] took it on his own". The Veteran suggested that his back problems led to his early retirement, but he also stated that no doctor had suggested that he take an early retirement as a result of his back disability. The Veteran indicated that he had not lost time from work in his final two years of employment because he had a job standing up and walking around. The Veteran indicated that he had attempted working in insurance and real estate, but he had been unable to continue because getting out of the car and climbing onto porches had aggravated his back symptoms. The Veteran had difficulty with physical activities, such as bending, and problems with extended sitting and rainy weather. 

In February 1997, the Veteran reported that he had worked as an insurance salesman, earning a commission, from November 1995 to March 1996. The Veteran stated "employers won't hire with back history if told about it". The Veteran stated that he could not sit or stand for a prolonged time, and he could not lift over 20 pounds. The Veteran indicated that "any activity" could cause his back pain to flare up, and although he had lost over 100 pounds, it had not alleviated his back pain. 

The Veteran underwent an additional examination in February 1997, at which time the Veteran reported that he had worked at the USPS and in insurance since his separation from service. The Veteran indicated that he had "not worked much" since May 1996. Although left lower extremity weakness was noted, the Veteran was able to stand on his heels and toes and was also able to squat. Neurologically, diminution of vibration was present in the left knee and ankle and 4/5 weakness was detected in the left leg. The examiner noted that the Veteran reported that weather and riding affected his back pain; however, the examination occurred on a cold and rainy day and the Veteran had ridden to the examination. As such, the examiner concluded that the Veteran was felt to be at "maximum disability." The Veteran did not have any increased loss of motion due to weakened movement, excessive fatigability, or incoordination. In essence, his pain did not significantly limit his functional ability. The examiner did not address whether the Veteran's symptoms prevented him from securing or maintaining gainful employment.

In July 1997, the Veteran reported that he had been in a car accident in May 1997, after which he experienced increasing pain and discomfort in the back. In July 1997 and September 1997, the Veteran criticized the findings of the February 1997 VA examiner. The Veteran disputed that it was raining at the time of the examination and that he was at "maximum disability" at the time of the examination. In support of this assertion, the Veteran claimed the examination had taken only five minutes and that the examiner failed to consider his reports of pain during the examination and his difficulty sleeping during the night. The Veteran claimed that he experienced periods of unremitting pain, but that at the time of the February 1997 VA examination he was not experiencing that level of pain.

The Veteran underwent an additional examination in April 1998, at which time the Veteran reported working for the USPS until 1993, at which time he reported that he retired as a result of his back disability. The Veteran reported that other than a six-month period of employment as an insurance salesman in 1993, he had not worked in the past 5 years. The Veteran reported experiencing constant lumbosacral pain radiating into the left lower extremity. The symptoms were aggravated by bending, lifting, sitting, and partially relieved by walking, heat, and medication. There was no evidence of weakened movement, excessive fatigability, or incoordination of movement. In an April 1998 neurological examination, the Veteran reported pain and numbness that caused difficulty walking up stairs, raking, and sweeping. The examiner noted that the Veteran had mild-to-moderate weakness in the quadriceps and anterior tibial muscles on the left, but preserved sensation and reflexes.

In April 1999, the Veteran indicated that he had only a "brief training period" with an insurance company from October 1995 to May 1996. The Veteran indicated that he quit because he could not tolerate the pain associated getting into and out of his car. The Veteran additionally indicated that he fell as a result of his back disability. The Veteran indicated that in 1998, he helped a friend "do a couple of auctions" and earned $850. The Veteran indicated that he could not be hired as a result of his severe back disability. 

In April 1999, the Veteran underwent an L3-5 lumbar decompression surgery. Hospital records indicate an uneventful recovery with reported relief of radicular pain. On discharge, the Veteran was instructed to stay out of work until his follow-up appointment, and to refrain from lifting objects weighing more than 40 pounds. The Veteran was awarded a temporary total evaluation from April 28, 1999 to August 1, 1999, as a result of convalescence associated with this surgery. 

In June 1999, the Veteran indicated that he became too disabled to work in 1992, but he last worked full-time in May 1996. The Veteran stated that he worked for 40 hours a week with the USPS as a clerk until August 1991, and lost "months" as a result of illness. The Veteran indicated that he worked in real estate from January 1992 to December 1992 and lost no time as a result of illness, earning up to $2,000 monthly in commissions. The Veteran worked for 40 hours a week in insurance sales from October 1995 to May 1996, and lost four days as a result of illness. The Veteran indicated that he was required to disclose his back disability when he applied for employment. The Veteran indicated that he was not qualified to teach because he did not get a teacher's certification with his degree. The Veteran indicated that his lack of experience and age also disqualified him from some jobs. 

In August 1999, the Veteran showed post-surgical improvement, but with residual symptoms of lower left extremity weakness, numbness, and paresthesia. The treating physician noted that the Veteran appeared to be "doing well except for multiple nonspecific complaints [that] especially seemed to revolve around lifting, driving, [and] anything having to do with work. The treating physician concluded that if the Veteran's x-rays were normal, then the Veteran "should be completely able to return to work full time at this point." The pending x-rays of the lumbosacral spine revealed normal spine alignment, and on August 17, 1999, the Veteran's treating physician released the Veteran to work subject to a lifting limitation of 50 pounds. 

In September 1999, the Veteran described his post-operative condition as "excellent", and he was fully ambulatory. In October 1999, there was point tenderness and slight pain on forward bending of the spine, but a good range of motion. The treatment provider noted the Veteran's prior lumbar decompression in April 1999, which had achieved "good results." The Veteran reported experiencing less pain and improved mobility.

An April 25, 2000 treatment record noted the return of severe low back pain, with an onset two months before. At that time, the Veteran reported that he was using a wheelchair and a cane to move and was unable to walk long distances. In May 2000, the Veteran underwent a secondary posterior lumbar laminectomy and decompression. A discharge summary from the associated hospitalization indicated that the Veteran had improved following his April 1999 surgery until he fell out of his truck in about March 2000. The Veteran was awarded a temporary total evaluation from May 10, 2000, to September 1, 2000, as a result of convalescence associated with this surgery. 

In April 2001, the Veteran reported that he began experiencing burning and unbearable pain in the right foot and both legs in May 2000. In an August 2001 examination, the Veteran reported that he last worked in 1992 as a clerk for the USPS. The Veteran indicated that he quit because of his "back problems and depression". 

In March 2002, the Veteran indicated that he became too disabled to work in 1993, but he last worked full-time in May 1996. The Veteran stated that he worked for 40 hours a week with the USPS as a clerk until 1993, and lost "lots" of time as a result of illness. The Veteran indicated that he worked in real estate for a "short time commission". The Veteran worked for 40 hours a week in insurance sales from October 1995 to May 1996 and until 1998 or 1999 when he left due to lumbar decompression with resulting complications. In May 2003, the Veteran indicated that since his May 2000 surgery, he had been forced to use a cane due to falling and dragging the left leg. 

In October 2014, the Veteran's representative provided a vocational opinion indicating that there was "no evidence that would establish a functional capacity for work... and that [the Veteran was] totally disabled from all forms of substantially gainful employment dating back to 1992". The opinion indicated that the Veteran suffered from chronic back pain since 1992 that limited the Veteran's capacity for exertion, and his ability to maintain postures, including sitting. The opinion indicated that the Veteran's back disability caused "fairly constant discomfort and pain which impaired concentration and the ability to work tasks". The opinion indicated that an "unacceptable level of work absence and daily deficits would be present". These functional deficits did not allow for competitive employment, even sedentary unskilled employment, dating back to 1992.

In December 2014, the Social Security Administration (SSA) reported that between January 1992 and December 2013, the Veteran only reported earnings of $572 in 1992, $3,146 in 1995, and $6,752 in 1996. 

Turning to an analysis of the facts in this case, affording the Veteran with the benefit of the doubt, and in consideration of the Veteran's statements and the income that the Veteran reported to the SSA, the Board finds that the Veteran's employment has been marginal at best since the Veteran's July 29, 1992, date of claim. While the weight of the evidence shows that the Veteran has not been gainfully employed since July 1992, the Board cannot find that the weight of the evidence supports a finding that the Veteran's service-connected back disability left him unable to secure and follow a substantially gainful occupation at any time before April 25, 2000. 

Before April 25, 2000, while clinicians may have acknowledged some limitations as a result of the Veteran's service-connected back disability (for example, an April 1999 clinician indicated that the Veteran should refrain from lifting items weighing more than 40 pounds), the Board cannot find that the weight of the evidence supports a finding that the Veteran could not secure and follow a substantially gainful occupation, given the Veteran's work history in a clerical position that, by the Veteran's own account, involved periods of sitting and standing. Instead, to the extent clinicians commented on the Veteran's employability, it was to permit the Veteran to return to work. For example, an August 1992 clinician indicated that if the Veteran had a sit-down job, the Veteran could return to work. An August 1999 clinician, even considering the Veteran's "multiple nonspecific complaints... [revolving] around lifting, driving, [and] anything having to do with work", released the Veteran to work subject to a lifting limitation of 50 pounds. The Board does not otherwise observe clinicians opining that the Veteran's back disability rendered him unable to secure or follow a substantially gainful occupation as a result of his service-connected back disability.

With that said, the Board notes that the October 2014 opinion of the vocational expert found that the Veteran was precluded from all forms of substantially gainful employment since 1992. Upon careful review of this opinion, however, the Board affords this opinion with relatively little probative weight. The opinion notes that it relies "only on [the] Veteran's service-connected conditions recognized in 1992" in its analysis. While it is true that the TDIU analysis considers only the occupational impairment posed by the Veteran's service-connected disabilities, the probative value of the 2014 opinion is lessened because it fails to discuss or consider the impact of non-service-connected injuries on the Veteran's employability. For example, the Veteran sustained a serious leg fracture in July 1992 that required surgical correction and physical therapy. While the 2014 opinion does not address this non-service-connected injury, it discusses follow-up treatment for this injury, for example an August 1992 treatment record, suggesting incorrectly that such treatment addressed the Veteran's service-connected back disability alone. Similarly, while the 2014 opinion discusses the Veteran's September 1996 hearing before the Board, it suggests that the Veteran discussed only symptomatology relating to his back; it does not acknowledge that during his hearing, the Veteran specifically associated his non-service-connected leg injury with his early retirement. 

Just as the vocational opinion failed to discuss the impact of injuries other than the Veteran's service-connected back disability, the opinion failed to discuss evidence that ran contrary to its conclusion. As noted above, on at least two occasions-August 1992 and August 1999-clinicians cleared the Veteran to return to work. The 2014 vocational opinion did not reconcile its finding that the Veteran was totally unable to participate in substantially gainful employment since 1992 with this contrary evidence. These omissions, which persist throughout the opinion, detract from its probative value, and the Board accordingly places relatively little probative weight on the opinion.

The Board acknowledges that the Veteran himself has frequently stated that his service-connected back disability rendered him unable to secure and follow a substantially gainful occupation before April 25, 2000. Furthermore, the Board acknowledges that the Court's September 2012 Memorandum Decision noted that the Board's July 2011 decision failed to adequately discuss and weigh the probative value of the Veteran's lay evidence against the other evidence of record. 

With that said, while the Board has carefully considered the Veteran's arguments, as discussed above, it cannot find that the weight of the medical evidence of record is consistent with the Veteran's statements. Furthermore, the Board finds that the Veteran's account of the impact of his symptoms on his occupational ability lacks credibility. For example, the Veteran filed his claim of entitlement to a TDIU fewer than two weeks after his fracturing his left leg, which is an injury that has not been connected to service. Indeed, during his September 1996 Board hearing, the Veteran stated that he took an early retirement at least in part because he "had the broken leg". Thus, the evidence most contemporaneous with the Veteran's 1992 retirement indicates that his non-service-connected leg fracture was, at the very least, relevant to his early retirement. Over time, the Veteran's account of the reasons for his retirement has changed, assigning increasing importance to his service-connected back disability alone: for example, in April 1998, stated that he retired solely because of his back disability. Similarly, during the Veteran's September 1996 hearing before the Board, the Veteran stated that not lost time from work in his final two years of employment because he had a job standing up and walking around. In June 1999, however, the Veteran stated that he had lost "months" as a result of his back disability. With these inconsistencies in the Veteran's account of his symptoms, and the trend over time towards assigning sole importance to the Veteran's service-connected back disability, the Board places greater weight on the statements that the Veteran made more contemporaneously with his 1992 separation from work than on his later statements. 

In addition to finding that the Veteran's description of the impact of his back disability on his work with the USPS lack credibility, the Board finds that certain statements that the Veteran has made regarding the severity of his symptoms lack credibility. For example, in October 1993, the Veteran reported that he had not been able to sit for 10 years as a result of his back pain. This statement is inconsistent with medical evidence preceding it, for example from August 1992 and August 1993, that showed the Veteran experienced periods of minimal back pain. Indeed, despite the Veteran's later contentions that he experienced, since his date of claim, back pain of a severity that precluded him from working, the medical evidence shows a symptom picture that involves back pain that comes and goes. 

As directed by the Court's September 2012 Memorandum Decision, the Board has considered the Veteran's contentions that he was on "a light duty status" and "in a protective category" before his early retirement from the USPS. The Board recognizes that both such contentions as to the Veteran's job status may have been correct at the time of his early retirement. As discussed above, however, the Veteran has explicitly stated that before his non-service-connected injury, he missed little time from his job, that he was employed on a full-time basis, and that his physical limitations as a result of his service-connected low back disability and residuals had been fully accommodated by switching job positions. These statements support a finding that before the Veteran's non-service-connected left lower extremity fracture, he was able to follow a substantially gainful occupation in his position with the USPS or another position with similar responsibilities and job duties. In reaching that conclusion, the Board has considered the definition of unemployability outlined in 38 C.F.R. § 4.18 (2016), but finds no evidence to suggest that the Veteran's job duties would fall under the category of a "special consideration" or otherwise fit the definition for unemployability. Instead, the Veteran was merely moved to a job position that would accommodate his lifting restrictions and other difficulties associated with his service-connected low back disability.

The Board does not doubt that before April 25, 2000, the Veteran's service-connected back disability had an effect on his employability, as evidenced by his 60 percent disability rating for that period. The weight of the evidence, however, does not support a finding that his service-connected back disability precluded his participation in substantially gainful employment during this time. Loss of industrial capacity is the principal factor in assigning schedular disability ratings. 38 C.F.R. §§ 3.321(a), 4.1 (2016). Indeed, 38 C.F.R. § 4.1 specifically states: "[g]enerally, the degrees of disability specified are considered adequate to compensate for considerable loss of working time from exacerbations or illnesses proportionate to the severity of the several grades of disability." See also Moyer v. Derwinski, 2 Vet. App. 289, 293 (1992); Van Hoose v. Brown, 4 Vet. App. 361, 363 (1993) (noting that the disability rating itself is recognition that industrial capabilities are impaired). Thus, upon a thorough review of the evidence of record, the Board finds that the Veteran was not precluded from securing or maintaining substantially gainful employment as a result of his service-connected disabilities at any time before April 25, 2000. As such, the benefit of the doubt doctrine is inapplicable, and an effective date before April 25, 2000, for the award of a TDIU must be denied. 38 C.F.R. § 5107(b) (2016); Gilbert v. Derwinski, 1 Vet. App. 49 (1990).


ORDER

An effective date earlier than April 25, 2000, for the award of a TDIU is denied. 




____________________________________________
THOMAS H. O'SHAY
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs